# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

MIDWEST REGIONAL ALLERGY, )
ASTHMA, ARTHRITIS & )
OSTEOPOROSIS CENTER, P.C., et al., )
                                   )
    Plaintiffs, )
                                   )
    v. ) No. 12-03351-CV-SW-DGK
                                   )
THE CINCINNATI INSURANCE COMPANY,)
                                   )
    Defendant. )

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This action presents an insurance dispute and breach of contract claim arising from a tornado that destroyed Plaintiffs' place of business in Joplin, Missouri on May 22, 2011. Pending before the Court are cross-motions for partial summary judgment on behalf of Plaintiffs Dr. Michael Joseph ("Dr. Joseph") and Midwest Regional Allergy, Asthma, Arthritis, & Osteoporosis Center, P.C. ("Midwest Regional") (Doc. 20) and Defendant Cincinnati Insurance Company ("Cincinnati") (Doc. 46).[1] Having fully considered the parties' arguments, the Court GRANTS Plaintiffs' motion for partial summary judgment and DENIES Defendant's motion for partial summary judgment.

### Background

The following facts are undisputed.

### I. Overview

Plaintiff Dr. Michael Joseph is the president of Midwest Regional Allergy, Asthma, Arthritis, & Osteoporosis Center, P.C., located in Joplin, Missouri. On May 22, 2011, a tornado

---

[1] In ruling on these motions, the Court has also considered Docs. 21, 22, 38, 40, 47, 50, 52, and 53.

1

struck Midwest Regional's clinic located at 1727 W. 26th Street ("the Premises"), destroying the Premises and rendering it inoperable for medical practice. The tornado also caused substantial damage to real and personal property located at the Premises. On or about June 27, 2011, Defendant Cincinnati Insurance Company made a preliminary building loss payment to Plaintiffs of $1,434,945.19.

## II. Midwest Regional's Operations Prior to the Tornado

Prior to the tornado, Midwest Regional primarily treated patients with allergies, asthma, arthritis, and osteoporosis. As part of its normal operations, Midwest Regional conducted diagnostics and treatments, including x-rays, MRIs, bone density scans, laboratory analysis, and infusion therapy. To conduct these tests and treatments, Midwest Regional owned an MRI machine, an x-ray machine, a bone density scanner, equipment for full laboratory analysis, and specialty infusion equipment.[2] Plaintiffs realized significant revenue from MRI imaging and laboratory services. The tornado damaged the MRI machine and destroyed the remainder of the above-referenced equipment.

## III. Midwest Regional's Relocation

As a result of the tornado's destruction of the Premises, Dr. Joseph chose to permanently relocate Midwest Regional to the second floor of the Gryphon building located at 1027 Main Street in Joplin, Missouri ("the Permanent Location"). Because the Permanent Location required extensive construction and preparation prior to Midwest Regional's move, Plaintiffs operated out

---

[2] Midwest Regional conducted a renovation in late 2009, adding approximately 5,000 square feet to house a specially-constructed MRI room, MRI machine, and additional infusion and lab services. Prior to installing the MRI machine, Midwest Regional referred patients requiring MRIs to local hospitals.

2

of a smaller, temporary location ("the Temporary Location") in Webb City, Missouri until construction was complete.[3]

While operating out of the Temporary Location, Midwest Regional was not able to function at its normal capacity. For example, Midwest Regional operated on a reduced schedule and generally did not accept new patients at this time. Additionally, because Midwest Regional did not install the above-referenced equipment at the Temporary Location,[4] it received no revenue from its MRI machine, x-ray machine, or other laboratory services.[5] Cincinnati paid Midwest Regional for the full amount of business income interruption loss it sustained during the time it operated out of the Temporary Location.

In preparing to move to the Permanent Location, Plaintiffs paid to have the MRI machine repaired. Plaintiffs also incurred costs preparing for, moving, and installing the MRI machine at the Permanent Location, including reinforcing the floor with a concrete slab to support the weight of the machine, removing and replacing exterior brick in order to install the machine, installing copper shielding and other specialty enclosures in the room where the machine was located, and installing specialized heating and cooling to support the machine. Additionally, Plaintiffs purchased a new x-ray machine, bone density scanner, equipment for laboratory analysis, and specialty infusion equipment and chairs. These costs were necessary for Midwest Regional to continue its medical practice in the manner it operated prior to the tornado.

---

[3] Midwest Regional began operating out of the Temporary Location within eight days of the tornado.
[4] The parties dispute why the MRI machine was not installed at the Temporary Location. Plaintiffs maintain that Cincinnati made the decision to pay for the MRI machine to be moved and stored while the Permanent Location was complete rather than pay for its installation at the Temporary Location. Defendant maintains that it did not make decisions regarding how Dr. Joseph equipped the Temporary Location. The parties agree that it would have taken the same amount of time to repair the MRI machine, prepare a room to house it, and install it at the Temporary Location as it did at the Permanent Location.
[5] Dr. Joseph cannot recall whether he referred any patients to a local hospital for an MRI during the time Midwest Regional operated out of the Temporary Location. Dr. Joseph testified that if a patient needed an MRI during this time, he would have referred the patient to a local facility with the necessary equipment.

3

Midwest Regional opened at the Permanent Location on May 1, 2012, within one year from the date of the tornado. After opening, technicians began performing MRIs at the Permanent Location, and Midwest Regional realized profits as a result.

**IV. Midwest Regional's Insurance Policy and Cincinnati's Payments**

At the time of the tornado, Plaintiffs were insured by a policy ("the Policy") issued by Cincinnati, which provides for certain categories of covered loss.[6] Under the Policy, the Joplin tornado was a "Covered Cause of Loss."

As noted above, on or about June 27, 2011, Cincinnati made a preliminary building loss payment to Plaintiffs of $1,434,945.19. On or about July 19, 2011, Cincinnati made an additional building loss payment to Plaintiffs of $622,913.31. On or about June 14, 2012, Cincinnati made a final building loss payment to Plaintiffs of $356,302.76. Cincinnati has now paid its policy limits for building loss, totaling $2,414,161.26.

Cincinnati also paid Plaintiffs the policy limit of $388,000.00 for business personal property.[7] Between August 12, 2011 and October 4, 2012, Cincinnati paid Plaintiffs $828,081.75 for business income interruption and extra expenses. Cincinnati has now paid Plaintiffs the full amount of business income loss related to their claim.

In total, Cincinnati has paid $3,655,243.01 for Plaintiffs' loss caused by the tornado at the Premises. Plaintiffs subsequently requested that Cincinnati reimburse them for several other expenses, including MRI repair and relocation and repair of other specialty equipment, under the "Extra Expense" provision of the Policy. Cincinnati denied Plaintiffs' request.

Section I(A)(5)(k) of the Policy's "Additional Coverages" section contains the Policy's provision relating to "Extra Expenses." The section provides, in relevant part:

---

[6] The Premises was underinsured at the time of the tornado.
[7] Plaintiffs submitted a claim for $1,999,687.26 for the total replacement cost of business personal property.

4

k.  Extra Expense

Section I—Property, D. Deductibles does not apply to this Additional Coverage.

(1) We will pay the necessary Extra Expense you incur during the "period of restoration"[8] caused by or resulting from a Covered Cause of Loss that you would not have incurred if there had been no direct physical "loss" to property at the "premises", including personal property in the open, or in a vehicle, within 1,000 feet of the "premises".

(2) Extra Expense means expense you incur:

(a) To avoid or minimize the "suspension" of business and to continue "operations":
  1) At the "premises"; or
  2) At a replacement location or temporary location, including
      a) Relocation expenses; and
      b) Costs to equip and operate the replacement or temporary location;
(b) To minimize the "suspension"[9] of business if you cannot continue "operations";[10]
(c) To:
  1) Repair or replace any property; or
  2) Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or **SECTION I—PROPERTY, A. Coverages, 5. Additional Coverages, c. Business Income.**

If any property obtained for temporary use during the "period of restoration" remains after resumption of normal "operations", the salvage value of that property shall be taken into consideration in the adjustment of the loss.

---

[8] "Period of Restoration" means the period of time that: "(1) Begins at the time of the direct physical 'loss'; and (2) Ends on the earlier of: (a) The date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (b) The date when business is resumed at a new permanent location" (Doc. 38-1, Section I—Property, H. Property Definitions, 12).
[9] The term "Suspension" is defined in the Policy as "a. The slowdown or cessation of your business activities; and b. That a part or all of the 'premises' is rendered untenable" (Doc. 38-1, Section I—Property, H. Property Definitions, 19).
[10] The term "Operations" is defined in the Policy as, "your business activities occurring at the 'premises.'" (Doc. 38-1, Section I—Property, H. Property Definitions, 11).

(3) We will only pay for Extra Expenses that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical "loss".

This Additional Coverage—Extra Expense, is not subject to the Limits of Insurance.

## Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must evaluate the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.

## Discussion

The facts of this case are, for the most part, undisputed. The parties do not dispute that the May 22, 2011 tornado was a "Covered Cause of Loss" under the Policy or that Cincinnati has paid the Policy limits for "Covered Property" and "Business Personal Property" loss.

6

The parties' dispute concerns payment of "Extra Expenses" under the Policy. Both parties seek summary judgment on Plaintiffs' breach of contract claim against Defendant, regarding reimbursement of the following categories of "Extra Expenses" incurred by Plaintiffs: (1) repair of Plaintiffs' MRI machine; (2) relocation of Plaintiffs' MRI machine; and (3) replacement of equipment to restore Plaintiffs' normal medical practice operations (collectively "the contested expenditures").[11] Because this contract dispute is purely a question of law, this case is ripe for summary judgment. *McCormack Baron Mgmt. Servs. Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. banc 1999).

### I. Missouri law requires courts to enforce the clear and unambiguous language of insurance policies.

Under Missouri law,[12] interpreting the meaning of an insurance policy is a question of law, *Boulevard Inv. Co. v. Capitol Indem. Corp.*, 27 S.W.3d 856, 858 (Mo. App. 2000), and courts should apply rules of contract construction. *Peters v. Emp'rs Mut. Cas. Co.*, 853 S.W.2d 300, 301-02 (Mo banc. 1993). In construing the terms of an insurance policy, the Court "applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Foremost Signature Ins. Co. v. Montgomery*, 266 S.W.3d 868, 871 (Mo. App. 2008) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)).

---

[11] The parties do not seek summary judgment on the remaining parts of Plaintiffs' breach of contract claim, including (1) damages, including prejudgment interest, and (2) miscellaneous extra expenses incurred after the tornado.

[12] The parties agree that Missouri law governs here. Federal courts sitting in diversity apply the choice of law of the forum state to determine the applicable law. *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991). Missouri has adopted the Restatement (Second) of Conflict of Laws for the purpose of determining which state's laws govern the interpretation of an insurance policy. *Reyes v. Nationwide Mut. Ins. Co.*, No. 4:10-CV-01381-NAB, 2011 WL 2314158, at *3 (E.D. Mo. June 9, 2011). Pursuant to the Restatement, the applicable law is determined by the state with the most significant relationship to the transaction and the parties. *Id.* Here, the Policy was negotiated and accepted in Missouri, the property at issue is located in Missouri, and Plaintiffs are residents of Missouri. Therefore, Missouri is the state with the most significant relationship to the transaction and the parties.

If the language in an insurance policy is "clear and unambiguous," the court must construe and enforce the policy as written. *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. banc 2008). Ambiguity exists "when there is duplicity, indistinctness, or uncertainty in the meaning in the meaning of the language of the policy." *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009). Where an insurance policy is ambiguous, the court must interpret the policy in favor of the insured. *Bellamy v. Pacific Mut. Life Ins. Co.*, 651 S.W.2d 490, 496 (Mo. banc 1983); *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. Ct. App. 2008). Courts should not interpret policy provisions in isolation but rather should evaluate the policy as a whole. *Ritchie*, 307 S.W.3d at 135. Specifically, courts should "give meaning to all terms and, where possible, harmonize those terms in order to accomplish the intention of the parties." *Macheca Transport v. Philadelphia Indem. Ins. Co.*, 649 F.3d 661, 669 (8th Cir. 2011) (applying Missouri law).

## II. The contested expenditures are "Extra Expenses" as defined in the Policy.

### A. The Policy's definition of "Extra Expenses" encompasses the contested expenditures.

The "Extra Expense" coverage in the Policy at issue reimburses the insured for "the necessary Extra Expense you incur during the 'period of restoration' caused by or resulting from a Covered Cause of Loss that you would not have incurred if there had been no direct physical 'loss' to property at the 'premises,' including personal property in the open, or in a vehicle, within 1,000 feet of the 'premises.'" The definition of "Extra Expense" is located in the "Additional Coverages" portion of the Policy. It states:

(2) Extra Expense means expense you incur:

    (a) To avoid or minimize the "suspension" of business and to continue "operations":

> 1) At the "premises"; or
> 2) At a replacement location or temporary location, including
>    a) Relocation expenses; and
>    b) Costs to equip and operate the replacement or temporary location.
> (b) To minimize the "suspension" of business if you cannot continue "operations";
> (c) To:
>    1) Repair or replace any property; or
>    2) Research, replace or restore the lost information on damaged "valuable papers and records";
>
> to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or SECTION I—PROPERTY, A. Coverages, 5. Additional Coverages, c. Business Income.

Doc. 38-1, Section I(A)(5)(k). "Suspension" is defined as "a. the slowdown or cessation of your business activities; and b. That a part or all of the 'premises' is rendered untenable" (Doc. 38-1, Section I—Property, H. Property Definitions, 19). "Operations" is defined as "your business activities occurring at the premises." *Id*. at 11.

Plaintiffs argue that the repair and relocation of the MRI machine, along with the replacement of Plaintiffs' other equipment falls squarely within the definition of "Extra Expenses" because Plaintiffs undertook these actions to minimize the slowdown of business and to continue business activities previously performed at the Premises. Defendant argues that the contested expenditures are not covered under the "Extra Expense" provision because they are subject to primary coverage under the "Covered Property" provision of the Policy.[13]

The Court holds that a plain reading of the language of the Policy supports Plaintiffs' argument. Based on the Policy language, for an expenditure to be recoverable as an "Extra Expense," it must be: (1) necessary (2) an "Extra Expense" as defined by the Policy; (3) incurred during the "Period of Restoration;" (4) caused by or resulting from a "Covered Cause of Loss;"

---

[13] *See* Part II.B for a thorough discussion of this argument.

9

and (5) an expense that would not have been incurred but for the physical loss to the property at the premises.

Elements one, three, four, and five are not at issue here. The tornado, a "*Covered Cause of Loss*," destroyed equipment that was *necessary* for Plaintiffs to continue their medical practice. Replacement of the equipment was necessary only because the tornado caused *physical loss at the Premises*, and Plaintiffs incurred the replacement expenses *during the one year* "*Period of Restoration*." The only issue is whether the contested costs are "Extra Expenses" as defined in the Policy.

The contested expenditures here are clearly "Extra Expenses" as the phrase is defined in the Policy. Plaintiffs repaired and replaced the MRI machine and other laboratory equipment in order to continue the business in which they were engaged at the Premises prior to the tornado. Accordingly, Plaintiffs *incurred* the expenses to a*void or minimize the slowdown of their business activities* and *continue those business activities previously performed at the Premises* at their new Permanent Location. Specifically, the disputed costs include *relocation expenses* and *costs to equip and operate* at the Permanent Location.[14]

### B. Plaintiffs are entitled to recover under the "Extra Expense" provision even though the contested expenditures might also be compensable under the "Covered Property" provision.

Defendant does not explicitly dispute that the contested expenditures meet the definition of "Extra Expenses" in the Policy. Rather, Defendant maintains that the contested expenditures are not compensable "Extra Expenses" because (1) the expenses are insured as "Covered

---

[14] The Court declines to address Defendant's argument that the contested expenditures are not compensable because they did not reduce Plaintiffs' business income loss, as required by the Policy, because this limitation applies only to "Extra Expenses" payable under Section I (A)(5)(k)(2)(c). Here, Plaintiffs' claims for "Extra Expenses" are brought under I (A)(5)(k)(2)(a), which has no similar limitation.

10

Case 3:12-cv-03351-DGK   Document 54   Filed 08/15/13   Page 10 of 14

Property" under the Policy; and (2) the expenses did not reduce the amount of Plaintiffs' business income loss under the Policy.[15]

Defendant's primary argument is that the contested expenditures are not recoverable under the *additional coverages* portion of the Policy as "Extra Expenses" because they are costs subject to *primary coverage* as "Covered Property." In making this argument, Defendant focuses on the purpose of the "Extra Expense" provision in relation to the Policy as a whole.

Under the Policy, Defendant agrees to pay for "direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss" (Doc. 38-1, Section I—Property, A. Coverages). "Covered Property" includes "Buildings" and "Business Personal Property." "Buildings" is defined as "the buildings and structures at the 'premises,' including . . . (2) Fixtures, including outdoor fixtures; (3) Permanently installed: (a) Machinery; (b) Equipment;" and other items. *Id*. "Business Personal Property" is defined as property "located in or on the buildings at the 'premises' or in the open (or in a vehicle) within 1,000 feet of the 'premises,' including: (1) Property you own that is used in your business; . . ." *Id*.

Defendant contends the MRI machine, x-ray machine, and other equipment are "Fixtures," "Permanently Installed Machinery/Equipment," or "Business Personal Property," and thus, are compensable as "Covered Property" and subject to those Policy limits.

Defendant presents a compelling argument that the contested expenditures are insured under the "Covered Property" portion of the Policy as "Fixtures,"[16] "Permanently Installed

---

[15] As noted above, the Court will not consider this argument. *See* footnote 14.
[16] The Missouri Court of Appeals has defined fixtures as follows:
> A fixture is an article of the nature of personal property which has been so annexed to the realty that it is regarded as a part of the land and partakes of the legal incidents of the freehold and belongs to the person owning the land. The term is expressive of the act of annexation and necessarily implies something that has existed apart from realty but which may, by being attached thereto,

11

Equipment,"[17] or "Business Personal Property."[18] Moreover, Defendant presents an intuitive argument that the intent of the Policy is to provide additional "Extra Expense" coverage *only* to supplement the primary coverage provided for under the "Covered Property" provision, not to supplant it. Accordingly, expenses subject to reimbursement as "Covered Property" should not be recoverable as "Extra Expenses." Additionally, courts should not allow an insured to use the "Extra Expense" provision as a way to circumvent the primary policy limits. *See Thompson v. Threshermen's Mut. Ins. Co.*, 172 Wis. 2d 275, 283 (Ct. App. 1992) (holding that the phrase "relocation expenses" and "costs to equip and operate" are ambiguous terms and must be interpreted to exclude items covered by the primary part of the policy because the parties did not contemplate these expenses to be reimbursable under the "Extra Expense" section); *Nassau Gallery v. Nationwide Mut. Fire Ins. Co.*, No. Civ.A. 00C-05-034, 2003 WL 21223843, at *3 (Del. Super. Apr. 17, 2003) (noting that insurance in the "Additional Coverage" section is intended to "protect[] an insured from specific losses, it is not a means to circumvent otherwise valid policy limitations").

However, the Policy language does not specifically prohibit coverage for "Extra Expenses" if the expense could also be reimbursed under the "Covered Property" provision. In fact, the Policy says nothing about the relationship between "Extra Expenses" and "Covered Property" and explicitly notes that "Extra Expenses" are "not subject to the limits of insurance." Moreover, the Policy defines "Extra Expenses" in a way that includes, and does not exclude, the

---

become a part thereof. Whether an article is a fixture or not depends upon the facts and circumstances of the particular case.

*Bastas v. McCurdy*, 266 S.W.2d 49, 51 (Mo. Ct. App. 1954). To determine whether an item is a fixture, Missouri courts typically focus on annexation, adaption, and intent, with intent being most important. *Id*.

[17] Plaintiffs admit in their statement of facts that the MRI and x-ray machine were "permanently installed."

[18] The Policy defines "Business Personal Property" as property "located in or on the buildings at the "premises" or in the open (or in a vehicle) within 1,000 feet of the 'premises,' including: (1) Property you own that is used in your business; . . ." (Doc. 38-1, Policy, Section I—Property, A. Coverages, 1(b)).

12

costs for which Plaintiffs now seek reimbursement. Defendant easily could have precluded Plaintiff from recovering the contested expenditures under the "Extra Expense" provision by including language that expressly excludes from "Extra Expenses" those costs that otherwise are reimbursable under the "Covered Property" coverage. *See Travelers Indem. Co. v. Pollard Friendly Ford Co.*, 512 S.W.2d 375, 378 (Tex. Civ. App. 1974).[19] However, Defendant did not include such language here.

Viewing the Policy in the light most favorable to Plaintiffs, the language of the Policy shows that the contested expenditures clearly fall within the "Extra Expense" provision. Viewing the Policy in the light most favorable to Defendant, there is an ambiguity. The language of the "Extra Expense" provision provides recovery of some items under both the primary "Covered Property" provision *and* the additional "Extra Expense" provision. However, the purpose of the "Extra Expense" provision seems to disallow any "Extra Expenses" already compensable under other provisions.

Under either view, Plaintiffs' interpretation of the Policy prevails. Either the "Extra Expense" provision clearly encompasses the contested expenditures here, or there is an ambiguity in the Policy which the Court construes in favor of the insured. *See Am. Home Assur. Co. v. Pope*, 591 F.3d 992, 999 (8th Cir. 2010) ("Missouri courts 'follow a construction favorable to the insured wherever the language of a policy is susceptible of two meanings, one favorable to the insured, the other to the insurer.'") (quoting *Meyer Jewelry Co. v. Gen. Ins. Co.*

---

[19] The language in the policy at issue in *Travelers* stated that: "*In no event*, however, *shall this Company be liable* under this policy for loss of income, nor for Extra Expense in excess of that necessary to continue as nearly as practicable the normal conduct of the insured's business, nor *for the cost of repairing or replacing any of the described property that has been damaged or destroyed by any peril insured against*, except cost in excess of the normal cost of such repairs or replacements necessarily incurred for the purpose of reducing the total amount of Extra Expense; liability for such excess cost, however, shall not exceed the amount by which the total Extra Expense otherwise payable under this policy is reduced" (emphasis added).

*of Am.,* 422 S.W.2d 617, 623 (Mo. 1968)).  Accordingly, the Court grants Plaintiffs' motion for partial summary judgment.

## Conclusion

The contested expenditures are "Extra Expenses" as defined in the Policy.  The Court GRANTS Plaintiffs' motion for partial summary judgment and DENIES Defendant's motion for partial summary judgment.

**IT IS SO ORDERED.**

Date: August 15, 2013                                   /s/ Greg Kays
                                                        GREG KAYS, JUDGE
                                                        UNITED STATES DISTRICT COURT